**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald J. WALSH, Jr., and Interrand Corp., Defendants-Appellants.**

**Nos. 84–1650, 84–1660.**

United States Court of Appeals, Tenth Circuit.

May 27, 1986.

Steven R. Bailey (Martin V. Gravis, with him on brief), Ogden, Utah, for defendants-appellants.

Bruce C. Lubeck, Asst. U.S. Atty. (Brent D. Ward, U.S. Atty., with him on brief), Salt Lake City, Utah, for plaintiff-appellee.

Before McKAY, McWILLIAMS and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

After a jury trial, appellants were convicted of two counts of possessing a firearm which was not identified by a serial number in violation of 26 U.S.C. § 5861(i).[1]

---

**1.** The statute provides in pertinent part:
§ 5861. Prohibited acts

It shall be unlawful for any person—

On appeal, appellants contend that evidence received by agents of the Bureau of Alcohol, Tobacco and Firearms (BATF) should have been suppressed and that 26 U.S.C. § 5861(i) should be construed to allow for a reasonable period of time within which to serialize a firearm. Because these contentions are not supported by existing precedent, we affirm.

Defendant-appellant Walsh, who is the president of defendant-appellant Interrand Corporation, was travelling from Washington, D.C. to a defense conference in Las Vegas, Nevada. He checked two pieces of luggage with a Western Airlines representative at Dulles International Airport in Washington. One was a silver colored rifle case declared as a firearm, the other was a green briefcase not so declared. The luggage was tagged with a destination of Las Vegas.

That evening, the briefcase was found near a baggage carousel in the Salt Lake City, Utah, airport by a local Western Airlines representative, Linda Erian. She found the briefcase just before closing at midnight and as part of a routine procedure of storing unclaimed baggage so that it might be restored to its rightful owner. Using standard keys, she attempted to open the locked briefcase because there was no identification or destination tag on the outside of it. Only able to open one lock, she placed a note on the briefcase explaining that it was without identification and that she was unable to open it. The note and briefcase were left for the morning shift.

The next morning, another Western Airlines employee in the lost and found section, Hillis Mohn, opened the other lock of the briefcase in an effort to find some identification or indicated destination on the inside. His purpose was to trace the ownership of the briefcase and get it re-stored to the right passenger. Record vol. I at 54, 60–61, 78. When he opened the briefcase, he found a firearms license, a registration form for certain firearms, pistols, clips and several suppressors,[2] including two unserialized suppressors at issue in this case. He then called airport security. While waiting for a security officer to arrive, he examined the suppressors and saw that some lacked serial numbers. Record vol. III at 61. He reported this to the BATF agent who arrived later. *Id.* at 66.

Prior to the arrival of airport security officers and a BATF agent, Mr. Mohn showed the briefcase and its contents to his supervisor, Harold Hardy. Record vol. III at 64, 83. Ultimately, Mr. Mohn and Mr. Hardy guided the BATF agent to the Western Airlines office where the briefcase was located and showed him the contents. *Id.* at 67–68, 79–81, 93.

Like the two Western Airlines employees, the BATF agent saw the firearms licenses, registration forms, two Heckler and Koch 9 millimeter semi-automatic pistols, magazines, ten ammunition clips and five suppressors. He also saw that two of the suppressors lacked serial numbers and accordingly took the briefcase and its contents into custody. Later that day, defendant Walsh telephoned the BATF agent from Las Vegas seeking to have the briefcase returned. Defendant Walsh explained then and at trial that, although the unserialized suppressors had been manufactured previously, he had not had a chance to serialize them and planned to do so upon his arrival in Las Vegas.

## I. Private search and subsequent seizure.

 Appellants contend that the warrantless search and subsequent seizure of the briefcase by the BATF agent violated the fourth amendment,[3] thereby requiring

---

(i) to receive or possess a firearm which is not identified by a serial number as required by this chapter (26 U.S.C. c. 53);

**2.** A suppressor or silencer is considered a firearm. 26 U.S.C. § 5845(a).

**3.** The fourth amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

exclusion of the inculpatory evidence. Specifically, appellants suggest that the absence of a warrant along with a lack of probable cause render the agent's inspection and seizure of the suppressors constitutionally infirm, even though two Western Airlines employees had previously conducted a private search of the briefcase.

The fourth amendment does not protect against all searches and seizures, but rather against those which are unreasonable. *United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986). Absent voluntary consent and subject to a few well-recognized exceptions, searches conducted without a warrant and probable cause are presumed unreasonable. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), *United States v. Gay,* 774 F.2d 368, 376 (10th Cir.1985). The protections of the fourth amendment, however, apply only to governmental action; a search or seizure, even if unreasonable, performed by a private person not acting as a government agent or in concert with a government official is not within the scope of the fourth amendment. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *United States v. Lambert,* 771 F.2d 83, 89 (6th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 598, 88 L.Ed.2d 577 (1986); *United States v. Andrews,* 618 F.2d 646, 652 (10th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980). The actions of the Western Airlines employees were private actions, not directed, controlled or initiated by government agents. *See United States v. Morgan,* 744 F.2d 1215, 1218–19 (6th Cir.1984) (airline employee's search of luggage amounted to private action). Therefore, the initial private activity of the carrier employees involved no interests protected by the fourth amendment. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921).

The viewing of the briefcase and its contents by the government agent thereafter did not require a warrant. In *Illinois v.*

*Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983), the Court discussed the fourth amendment implications of a common carrier's discovery of contraband and notification of law enforcement personnel. The Court said:

> When common carriers discover contraband in packages entrusted to their care, it is routine for them to notify appropriate authorities. The arrival of police on the scene to confirm the presence of contraband and to determine what to do with it does not convert the private search by the carrier into a government search subject to the Fourth Amendment. *E.g., United States v. Edwards,* 602 F.2d 458 (CA1 1979).

*Andreas,* 463 U.S. at 769 n. 2, 103 S.Ct. at 3323 n. 2. Suspecting contraband, the airline employees could convey the information they obtained and the government agent could then replicate their previous inspection without violating the fourth amendment.

This conclusion is consistent with recent Supreme Court precedent concerning private searches. In *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), several securely sealed cartons of films depicting homosexual activities were mistakenly delivered to an Atlanta company. Employees of the company opened the cartons and examined the individual boxes of film, which had suggestive drawings and explicit descriptions. They then called government agents who picked up the films and later viewed them on a projector. The Court determined that the films should have been suppressed.

The plurality opinion recognized that the government could acquire the packages and examine their contents to the extent of the private search, however, the projection of the films by the government agents was a significant expansion of the private search, or an independent search, which required a warrant. *Walter,* 447 U.S. at 656, 100 S.Ct. at 2401. The concurring justices agreed that the government agents

place to be searched, and the persons or things to be seized.

U.S. Const. am. IV.

could examine the contents of the packages which had been opened by private parties, but only to the extent of what was in plain view. *Walter,* 447 U.S. at 660–61, 100 S.Ct. at 2403–04 (White, J. concurring in part). Thus, even had the private parties viewed the films before turning them over to the government, a warrant would have been required for government projection of the films because the owners of the films still retained a legitimate expectation of privacy in their contents. *Id.* at 660–61, 100 S.Ct. at 2403–04; *see also Stanley v. Georgia,* 394 U.S. 557, 569–72, 89 S.Ct. 1243, 1250–51, 22 L.Ed.2d 542 (Stewart, J. concurring).

This case differs in a very important respect from *Walter v. United States* and leads us to a different result. In this case, the government agent merely repeated the private search and inspected what was in plain view. A carrier employee had previously examined the silencers and noted the absence of serial numbers.[4] Appellants' primary argument is that the agent inspecting the suppressors for serial numbers lacked probable cause because the briefcase and its contents were not clearly contraband. Yet at the invitation of the carrier, the government agent was entitled to inspect the suppressors for serial numbers even in the absence of probable cause because he was merely repeating what the carrier employees had done. Appellants' premise that the agent's inspection of the suppressors for serialization somehow exceeded the scope of the private search does not appear to be consistent with the trial testimony on this point.

In *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), Federal Express employees opened a damaged package and found several plastic bags of white powder inside a closed tube covered by crumpled newspaper. The carrier notified the Drug Enforcement Administration (DEA) and put the package back together. The responding DEA agent saw at least the damaged package and the tube when he arrived at the carrier's location. He removed four plastic bags, saw the white powder and then cut open each of the four to obtain a sample for a field test which identified the powder as cocaine.

A majority of the Court determined that no unreasonable search or seizure of the contraband had occurred after testing the legality of the government's search by the scope of the antecedent private search. *Jacobsen,* 466 U.S. at 116, 104 S.Ct. at 1658. The Court analyzed the activities of the government agents in two steps. Removing the tube from the package, taking the plastic bags out of the tube and then taking some white powder from the plastic bags was acceptable for several reasons. It was virtually certain that the government's search would not reveal anything more than the government agent had already been told by the carrier. *Id.* at 119, 104 S.Ct. at 1659–60. Any privacy interest in the contents of the package had been eliminated because the package was unsealed and had been inspected by the carrier's employees who then invited the government to do likewise. The DEA agents' assertion of dominion and control over the package and its contents amounted to a constitutionally acceptable seizure because there was no reasonable expectation of privacy in the package by this time and there was probable cause to believe it contained contraband. *Id.* at 121–22, 104 S.Ct. at 1660–61.

The field test of the powder, which exceeded the scope of the private search, was not an unlawful search or seizure. A test which merely discloses whether a sub-

---

**4.** The trial court so found:

THE COURT: ... But here, the agent, Mr. Minichino, didn't do a thing that the private people didn't do, and it seems to me that that's why Mr. Mohn's (the carrier employee's) having found that they (the suppressors) weren't serialized, in a way, aids the government on the motion to suppress, because I can see that

if you had to reach in and do more than the private people did, you might have a search that the private people hadn't done. They (the private people) have done everything. Why should you go get a warrant when you have already found it out through private people?

Record vol. III at 128.

stance is cocaine does not compromise any legitimate expectation of privacy, regardless of the results. *Id.* at 123, 104 S.Ct. at 1662. The test could only reveal the presence or absence of contraband. The Court's decision is consistent with *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983), where the use of dogs trained to sniff out narcotics in luggage did not constitute a search under the fourth amendment due to the minimally intrusive nature of such a search. Finally, the Court looked to the reasonableness of the destruction of the powder involved in the field test and concluded that the destruction had only a de minimis effect on any property interest in the contraband and was outweighed by the substantial law enforcement interests in testing for narcotics. *Jacobsen,* 466 U.S. at 125, 104 S.Ct. at 1663.

■ *United States v. Jacobsen* strongly suggests that even had the BATF agent exceeded the scope of the private search by examining the two suppressors for serialization, this examination would not constitute a search under the fourth amendment. The private search by the Western Airlines employees revealed the contents of the briefcase including the suppressors. Pursuant to the express invitation of the employees, the BATF agent inspected the items in the briefcase. These items were in plain view once the carrier employees reopened the briefcase and could no longer support a reasonable expectation of privacy.[5] The agent's viewing the circumference of the suppressors to ascertain whether each had a serial number would be analogous to a field test for narcotics approved in *Jacobsen.* Whenever a firearm is in plain view, such a procedure is acceptable because it merely discloses the existence of a serial number as well as the number itself. *See New York v. Class,* — U.S. —, —–—, 106 S.Ct. 960, 965–67, 89 L.Ed.2d 81, 90–91 (1986) (no reasonable

expectation of privacy in vehicle identification number required to be in plain view).

In this case, however, the record supports that the BATF agent's examination of the briefcase merely repeated what the private search already uncovered—a briefcase with guns, suppressors and paperwork. One of the carrier employees testified, and the trial judge so found, that the private search revealed two suppressors without serial numbers. Record vol. III at 66–67, 128–29. Thus, the government agent's search did not exceed the scope of the private search and did not come within the protections of the fourth amendment.

Appellants necessarily contend that the BATF agent's assertion of dominion and control over the briefcase when he took it into custody was a seizure under the fourth amendment. *United States v. Jacobsen,* 466 U.S. 109, 120, 104 S.Ct. 1652, 1660, 80 L.Ed.2d 85 (1984), *but see Walter v. United States,* 447 U.S. 649, 652–53 n. 4, 100 S.Ct. 2395, 2399–2400 n. 4, 65 L.Ed.2d 410 (1980) (Stevens, J. concurring) ("For purposes of decision, we accept the Government's argument that the delivery of the films to the FBI by a third party was not a "seizure" subject to the warrant requirement of the Fourth Amendment.") Though not accomplished with a warrant, several factors indicate that this seizure was not an unreasonable one.

■ As previously discussed, appellants' privacy interests in the unclaimed briefcase and its contents were substantially reduced by the private search. The weapons and suppressors in the briefcase were in plain view of the BATF agent. While it is true that suppressors are not unlawful per se, like other firearms their origination and use is subject to considerable regulation. 26 U.S.C. c. 53; 27 C.F.R. pt. 179; 18 U.S.C. c. 44 & appendix II. The lack of serial numbers on two of the suppressors certainly gave the trained BATF

---

**5.** It is of no significance that the briefcase was closed when the BATF agent arrived and then reopened for him by a carrier employee. The happenstance of whether a government agent, let alone a carrier employee not in concert with the government, reopens that which has been searched privately does not convert "an otherwise private search into an unreasonable official search." *United States v. Blanton,* 479 F.2d 327, 328 (5th Cir.1973).

agent probable cause to believe the briefcase contained contraband. *Cf. United States v. Rose,* 695 F.2d 1356, 1358 (10th Cir.1982), *cert. denied,* 464 U.S. 836, 104 S.Ct. 123, 78 L.Ed.2d 121 (1983) (federal firearms agents recognized potentially incriminating evidence).

■ It was not unreasonable for the BATF agent to then take the briefcase and its contents into his custody:

It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable. (Footnote omitted.) Yet it is also well settled that objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.

*Payton v. New York,* 445 U.S. 573, 586–87, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). *See also Coolidge v. New Hampshire,* 403 U.S. 443, 471, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971). The firearms license and the registration forms found in the briefcase did not as a matter of law dispel the probable cause to associate the contents of the briefcase with criminal activity. We conclude that the seizure of the briefcase and its contents was supported by probable cause and, therefore, was reasonable.[6]

In sum, we find that the seizure of the suppressors was not contrary to the fourth amendment. This is consistent with other cases which have considered private searches by airline employees which have resulted in the discovery of firearms. In *United States v. McDaniel,* 574 F.2d 1224 (5th Cir.1978), *cert. denied,* 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979), the defendant checked his briefcase on a flight

from Atlanta to Tampa, but it was misrouted and arrived in Manhattan, Kansas. The briefcase was unclaimed and had no external identification. An airline employee opened the briefcase to determine ownership and discovered two loaded firearms. The carrier employee closed the briefcase and notified local police who in turn contacted the BATF. The responding BATF agent was given the briefcase and the employee and the agent inventoried the contents. Given the initial private search by the carrier employee, the Fifth Circuit concluded the government agent did not need a warrant to receive the briefcase. Because the airline had voluntarily notified authorities and turned over the briefcase to them, the government's action did not constitute a separate search or seizure which would require a warrant. *McDaniel,* 574 F.2d at 1225–27. *See also United v. Blanton,* 479 F.2d 327 (5th Cir.1979).

II. Time allowed for placing a serial number on a firearm and possession of a firearm not bearing a serial number.

■ Appellants contend that the trial court erred by not instructing the jury as follows:

If you find that there has not been a lapse of reasonable time between the manufacture of the firearm and the time that the firearm was seized, you should find the defendant not guilty of [possessing] firearms that do not have serial numbers.

Record vol. IV at 225. Such an instruction is not an accurate statement of the law; consequently, the trial court was correct in declining to so instruct.

It is unlawful to possess or receive a firearm which is not identified by a serial number. 26 U.S.C. § 5861(i). Those who manufacture, import or possess firearms must identify them with a serial number and certain other information. 26 U.S.C. § 5842(a) & (b).[7] An applicable Treasury

---

6. Once the government had acquired lawful possession of the suppressors without serial numbers, there was no requirement, as appellants contend, that it then obtain a warrant in order to run ballistics tests on the suppressors.

7. Section 5842 provides in pertinent part:

**§ 5842. Identification of firearms**
**(a) Identification of firearms other than destructive devices**
 Each manufacturer and importer and anyone making a firearm shall identify each fire-

regulation requires each manufacturer or importer to legibly identify each firearm by engraving, casting, stamping, impressing or otherwise conspicuously identifying the following information on the firearm: an individual serial number; the model, if such designation has been made; the caliber or gauge; the name of the manufacturer or importer and its place of business; and, in the case of an imported firearm, the country of manufacture. 27 C.F.R. § 179.102.

Another Treasury regulation concerns the registration of firearms which are manufactured. It provides that each manufacturer must file with the BATF director an accurate notice on Form 2, Notice of Firearms Manufactured or Imported, to show his manufacture of firearms. 27 C.F.R. § 179.03. The notice must set forth the following information: the name and address of the manufacturer, his tax stamp and number and his federal firearms license number. *Id.* It must also show the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers and other marks of identification of the firearms manufactured. *Id.*

This Treasury regulation is specific as to when Form 2 must be filed:

All firearms manufactured by him during a single day shall be included on one notice, Form 2 (Firearms), filed by the manufacturer no later than the close of the next business day. The manufacturer shall prepare the notice, Form 2 (Firearms), in duplicate, file the original notice as prescribed herein and keep the copy with the records required by Subpart I of this part at the premises covered by his special (occupational) tax stamp. Receipt of the notice, Form 2 (Firearms) by the Director shall effectuate the registration of the firearms listed on that notice.

27 C.F.R. § 179.103. A fair reading of the above Treasury regulation leads to the conclusion that before a Form 2 can be filed and before a firearm can be registered, a manufacturer must have placed a serial number on the firearm. This serial number is then reported on Form 2.

Appellants contend that because the Treasury regulation allows a Form 2 to be filed no later than the close of the next business day after manufacture, a serial number may be placed on the firearm within that time and satisfy the requirement of 26 U.S.C. § 5842(a) that a firearm be serialized. Under appellants' theory, a manufacturer could possess an unserialized firearm subsequent to manufacture but before the close of the next business day and not violate 26 U.S.C. § 5861(i).

▪ We reject this theory and hold that a manufacturer must place a serial number on a firearm prior to or immediately upon completion of the firearm.[8] The registration procedure for manufactured firearms contained in the Treasury regulation does not provide additional time within which to place a serial number on a firearm. Likewise, the Treasury regulation dealing with the registration of imported firearms, which provides that a Form 2 must be filed not later than fifteen days from the date the firearm is released from Customs custody, does not provide additional time within which to place a serial number on an imported firearm. 27 C.F.R. § 179.112.

---

arm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and any such other identification as the Secretary may by regulations prescribe.

**(b) Firearms without serial number**
Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) of this section shall identify the firearm with a serial number assigned by the Secretary and any other information the Secretary may by regulations prescribe.

8. A firearm frame or receiver which is not a component part of a complete weapon at the time it is sold, shipped or otherwise disposed of by a manufacturer, importer or maker also must have a serial number placed on it. 27 C.F.R. § 179.102.

In *United States v. Ranney*, 524 F.2d 830 (7th Cir.1975), *cert. denied*, 424 U.S. 922, 96 S.Ct. 1130, 47 L.Ed.2d 330 (1976), defendant was convicted of possessing a shotgun without a serial number in violation of 26 U.S.C. § 5861(i). On appeal, one of defendant's arguments was that the law afforded him a reasonable period of time to obtain a serial number because 26 U.S.C. § 5842(b) provides that a person who possesses a firearm without a serial number shall identify it with an assigned serial number. Appellants in this case make the same argument. In rejecting it, the Seventh Circuit noted that § 5861(i) proscribed not only the possession of a firearm without a serial number, but also its very receipt. The court was unwilling to read the National Firearms Act in such a way that there could be a period of lawful possession of such a firearm, yet the act of receiving the firearm would be unlawful. *Ranney*, 524 F.2d at 833. Such a reading would conflict with the clear language of § 5861(i) which prohibits the possession of a firearm not identified with a serial number.

Appellants attempt to distinguish *Ranney* claiming that the facts of this case are significantly different. Appellant Walsh testified at trial that he assembled the two unserialized suppressors on April 27, 1983, although he initially told the BATF agent that they had been manufactured two days earlier. Record vol. IV at 212, 147. He had expected to receive all the components to assemble the suppressors by April 17th. *Id.* at 187. In anticipation, he prepared the Form 2 on April 17th, assigning serial numbers to the then unmanufactured suppressors. *Id.* at 189, 199, 204. The date of manufacture was listed as April 17th and the form was filed with the BATF on April 26th. Record vol. III at 76, 103; vol. IV at 150, 207. Thus, the Form 2 was dated and filed before the suppressors were even manufactured on April 27th. Appellant Walsh explained that he did not have time to serialize the two suppressors before leaving to attend a defense conference in Las Vegas and that he had taken appropriate tools with him so that he could mark the serial numbers on the suppressors once he arrived in Las Vegas.

Appellants suggest that *Ranney* should not apply because the defendant in that case traded the shotgun he had obtained without a serial number to undercover agents, whereas appellant Walsh was not trying to sell or transfer the suppressors; rather, until the briefcase was lost, he had actual or constructive possession of the suppressors from the time of manufacture. Appellants also suggest that the shotgun in *Ranney* was not registered, whereas appellant Walsh had filed the registration documents covering the suppressors.

■ These are distinctions that do not make a difference. We agree with the rationale of *Ranney* and find it fully applicable. The defendant in that case was convicted of possession of a firearm not identified by a serial number just as appellants were. The Seventh Circuit's decision did not turn on prior or subsequent transfers of the firearm, rather it was the act of possession that was dispositive. And merely because a recently manufactured firearm has been registered would not obviate the requirement that it be identified "by a serial number which may not be readily removed, obliterated or altered." 26 U.S.C. § 5842(a).[9]

■ Appellants next turn the court's attention to two predecessor statutes involving firearms. One required a manufacturer or importer to place an identifying number or mark on a firearm. The other statute made it unlawful to obliterate, remove, change or alter such an identifying number or mark, and provided that possession of such a firearm was sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury. Act of Aug. 16, 1954, ch. 736 (former §§ 5843 & 5852 of tit. 26), 68A Stat. 725, 728, *amended by*, Act of Sept. 2, 1958, tit. II, § 203(e), 72 Stat. 1427, *repealed by*, Act of Oct. 22, 1968, tit. II,

---

9. We note that placing a serial number on a manufactured firearm certainly appears to be a prerequisite to registration. 17 C.F.R. §§ 179.-103 & 179.112.

§ 201, 82 Stat. 1230, 1233; *see also Sizemore v. United States,* 393 F.2d 656, 658 n. 1 (8th Cir.1968) (a defendant had a reasonable period of time between finding and seizure of an unregistered firearm to register it under a prior registration statute which provided that possession of an unregistered firearm was sufficient evidence to authorize conviction unless defendant explains such possession to the satisfaction of the jury (dicta)); *Haynes v. United States,* 372 F.2d 651 (5th Cir.1967), *rev'd,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

Appellants' reliance on the predecessor statute allowing for a satisfactory explanation of possession is unpersuasive for several reasons. First, § 5861(i) deals expressly with the receipt or possession of a firearm which is not identified by a serial number; that predecessor statute concerns the obliteration, removal, change or alteration of serial numbers or identifying marks which is now proscribed by 26 U.S.C. § 5861(h). Second, there simply is nothing in § 5861(i) which suggests that a satisfactory explanation of possession was meant to be statutory defense. That part of the predecessor statute allowing for an explanation of possession "is conspicuously absent from § 5861." *United States v. Parker,* 566 F.2d 1304, 1306 n. 3. (5th Cir.), *cert. denied,* 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978).

Finally, appellants contend that § 5861(i) should not be applied to them in this instance because to do so would place an undue or unnecessary federal restriction on legitimate manufacturers.[10] As the Supreme Court has observed, the National Firearms Act as amended in 1968 "is a regulatory measure in the interest of public safety." *United States v. Freed,* 401 U.S. 601, 609, 91 S.Ct. 1112, 1118, 28 L.Ed.2d 356 (1971); *see also* H.R.Rep. No. 1956, 90th Cong., 2d Sess. (1968), *reprinted in,* 1968 U.S.Code Cong. & Admin.News 4410, 4426, 4434–35 (scope of National Firearms

Act extended and penalties for violation increased). Accordingly, there need not be a showing of specific intent or knowledge that a firearm is unregistered or without a serial number. *United States v. Freed,* 401 U.S. at 607, 91 S.Ct. at 1117; *United States v. Ranney,* 524 F.2d 830, 832. A serial number allows a firearm to be traced. Appellant Walsh testified that the average time it took him to stamp a firearm with a serial number was ten or fifteen minutes. Record vol. IV at 185. The suppressors were manufactured in Washington, D.C. and were lost in Salt Lake City, at least temporarily. There was a real possibility that the suppressors could have found there way into circulation before they had been serialized. Under these circumstances, this application of the statute does not appear to be an undue or unnecessary federal restriction.

Appellants' proposed jury instruction rests on two assumptions: 1) that a defendant charged with a violation of § 5861(i) who admits the proscribed possession of a firearm without a serial number may offer an explanation of such possession to the jury, and 2) that a defendant who is a manufacturer has a reasonable amount of time subsequent to manufacture or assembly during which he may physically place a serial number on a firearm. We have rejected both propositions. Denial of a requested instruction which is either wholly or partially incorrect is not error. *United States v. Stoddart,* 574 F.2d 1050, 1053 (10th Cir.1978); *McCarty v. United States,* 409 F.2d 793, 798–99 (10th Cir.), *cert. denied,* 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969). Consistent with the above, appellants' motion for judgment of acquittal was properly denied by the district court.

AFFIRMED.

---

10. Appellants cite the statement of purpose accompanying and applying to title I of the Gun Control Act of 1968, tit. I, § 101, 82 Stat. 1213–

14. 26 U.S.C. § 5861, however, was enacted as part of title II of that Act at 82 Stat. 1234.